IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SARAH J., | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 18 C 4354 |
| v. | ) |
| | ) Magistrate Judge Gabriel A. Fuentes |
| ANDREW M. SAUL, Commissioner of | ) |
| Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, Sarah J.[3] ("Plaintiff"), has moved for summary judgment seeking reversal or remand of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her claims for Supplemental Security Income ("SSI") and Disability

---

[1] The Court substitutes Andrew M. Saul for his predecessor, Nancy A. Berryhill, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On July 16, 2018, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to Magistrate Judge Finnegan for all proceedings, including entry of final judgment. (D.E. 10). On May 31, 2019, by executive committee order, this case was reassigned to this Court for all proceedings, including entry of final judgment. (D.E.8).

[3] The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id.* A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id.*, citing *Doe v. Blue Cross & Blue Shield Unites of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing. Put to such a showing here, a party may well be able to demonstrate that suppressing the surname of the plaintiff inflicts little or no prejudice upon the government defendant, but establishing that the circumstances favoring privacy are so exceptional as to outweigh the public policy in favor of identified parties would be more challenging. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated. The Court's understanding is that the claimants' names in all of these matters brought for judicial review under the Social Security Act are otherwise available upon a review of the public docket.

Insurance Benefits ("DIB"), brought pursuant to Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 405(g), 423. (D.E. 11, 12: Pl.'s Mot. for Sum. J. and Mem. in Support of Sum. J.) The Commissioner has filed his own motion seeking affirmance of the decision denying benefits (D.E. 24: Def.'s Mem. in Support of Sum. J.), and Plaintiff has filed a reply. (D.E. 26.) For the following reasons, Plaintiff's motion for remand is granted and the Commissioner's motion is denied.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for benefits on April 1, 2013, alleging that she was disabled due to chronic discoid lupus ("DLE"),[4] cognitive delays and dyslexia, and that her disability began on March 1, 2013. (R. 187, 199.) Her date last insured was June 30, 2017. (R. 565.) After her claims were denied, Plaintiff participated in a hearing before an Administrative Law Judge ("ALJ") on November 17, 2014. (R. 16.) The ALJ issued a ruling on May 12, 2015, finding that Plaintiff was not disabled. (R. 16 – 24.) On appeal, the district court issued a written opinion remanding the case on the ground that the ALJ had not adequately explained his reasons for discounting the opinion of Plaintiff's treating doctor, David Ellens, M.D. *Johnson v. Berryhill*, No. 16 C 8850, 2017 WL 3620807 at *2 (N.D.Ill. August 23, 2017) ("*Johnson I*"). The court declined to address Plaintiff's other arguments but instructed that on remand, the ALJ was to "reevaluate Plaintiff's physical and mental impairments and RFC, considering all of the evidence of record." *Id.* at *12.

The Appeals Council then remanded the case for the ALJ to take further proceedings consistent with the opinion of the District Court. (R. 683.). Thereafter, on March 5, 2018, Plaintiff participated in a second hearing before the same ALJ at which Plaintiff and a vocational expert

---

[4] Discoid Lupus Erythematosus ("DLE") is a chronic skin condition of sores with inflammation and scarring, most commonly affecting the face, ears, and scalp, and at other times other body areas. https://www.aocd.org/page/DiscoidLupusErythe *visited on* October 17, 2019.

2

("V.E.") testified; on March 30, 2018 the ALJ issued a second ruling finding Plaintiff was not disabled. Plaintiff appealed, and the Appeals Council declined to review the ALJ's decision, making it the final decision of the Commission. 20 C.F.R. § 404.981; *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015).

## II. BACKGROUND

### A. Medical Evidence

Plaintiff has been treated for DLE, primarily involving the scalp, since 2009. In late 2012, just prior to her alleged onset date, Plaintiff began experiencing a flare-up of her lupus symptoms, including hair loss, the increase of sores, boils, and dry patches of skin on her head and elsewhere, and sore joints.[5] *See Johnson I*, 2017 WL 3620807 at *3-4. Between March 2013 and December 2014, Plaintiff had regular appointments with dermatologist, Michelle Ovando, M.D., rheumatologist, Raymond Kazmar, M.D., and internist, David Ellens, M.D. (R. 344, 351, 358, 394, 402, 488-89.) These doctors prescribed Plaintiff a number of different medications, including Plaquenil,[6] Bactrim to treat an infection on her scalp, lotions and creams for her skin, and the steroid Prednisone. (*Id.*, R. 307.) Several months later, Bactrim was discontinued due to unspecified side effects. (R. 352.)

At these appointments, at times Plaintiff complained of fatigue, tiredness and knee pain, in addition to her skin problems on her scalp. (R. 393-94, 483, 485.) In October 2013, Dr. Kazmar diagnosed arthritis pain in the knees and spine. (R. 488.) On January 14, 2014, Plaintiff complained to Dr. Ellens about intermittent chest pain and that she had also had pain in her legs for the past

---

[5] Plaintiff's lupus caused a number of severe skin symptoms, including lesions, scarring, alopecia, cysts, open sores, and other similar issues.

[6] Plaquenil is an anti-malarial drug that is also used to treat the skin rashes and joint pain associated with lupus. https://www.hopkinslupus.org/lupus-treatment/lupus-medications/antimalarial-drugs/ *visited on* October 16, 2019.

3

few months. (R. 391.) Plaintiff then followed up with cardiologist, Kelly Rychter, D.O., complaining of chest pain, shortness of breath with exertion, joint aches, fatigues, and dizziness. (R. 374, 376, 371.) X-rays of Plaintiff's lumbar spine in April 2014 were negative. (R. 482.) At additional appointments with Dr. Ellens in August and September 2014, Plaintiff continued to complain of occasional tiredness and fatigue, shortness of breath with exercise, as well as a scalp flare-up. (R. 387-89.) Dr. Ellens referred Plaintiff to dermatology and rheumatology for treatment. (*Id.*)

The record contains two medical opinions, both dated prior to the first hearing: that of Dr. Ellens and that of the state agency doctors who reviewed the record as part of Plaintiff's claim for benefits. On June 5, 2013, these non-examining state agency doctors determined Plaintiff's impairments did not meet Listing 8.04, "chronic infections of skin or mucous membranes" and that therefore, she was not disabled. (R. 64-69.) The doctors relied on a March 2013 examination report that noted scalp lesions and inflamed areas on Plaintiff's head and found a full range of motion without pain in all extremities. (R. 69-70.) The doctors acknowledged Plaintiff's reports of pain but found her only partially credible. (*Id.*) On reconsideration, Francis Vincent, M.D. acknowledged Plaintiff's complaints of worsening pain and her scalp flare-up in August 2013, but considered all of her issues addressed with the medication Plaquenil. (R. 86.) Dr. Vincent affirmed the finding that Plaintiff was not disabled on December 18, 2013. (R. 90.)

Dr. Ellens' January 31, 2014 opinion consisted of a pre-printed form that contained the requirements for Listing for 14.02 – Systemic Lupus Erythematosus ("SLE"),[7] which requires:

A. Involvement of two or more organs/body systems, with:

---

[7] Lupus erythematosus can manifest in different ways. The discoid type ("DLE") primarily affects the skin, while the systemic type ("SLE") can also affect internal organs and other parts of the body.. https://www.lupus.org/resources/types-of-lupus. *visited on* October 23, 2019.

> 1. One of the organs/body systems involved to at least a moderate level of severity; and
> 2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

OR

> B. Repeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
>
> 1. Limitations of activities of daily living;
> 2. Limitation in maintaining social functioning; and
> 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

The form asked whether Plaintiff "meets or equals the above referenced requirements." (R. 365.) In opining that Plaintiff met the Listing, Dr. Ellens circled the number "2" under subheading A and the numbers "2" and "3" under subheading B. (*Id.*) When asked to explain how he came to this conclusion, he wrote "see above." (*Id.*) Dr. Ellens also gave his opinion about Plaintiff's residual functional capacity, limiting her to carrying 10 pounds occasionally and up to five pounds frequently, standing for less than one hour per day and sitting for less than two hours per day, as well as providing a number of postural limitations, including never being able to push or pull with her feet, climb ramps, stairs, ladders or ropes, kneel, crouch or crawl. (R. 366.) Dr. Ellens also wrote that Plaintiff was cognitively delayed, dyslexic, and had a learning disability. (*Id.*)

Plaintiff continued to receive medical treatment after the first hearing. Between February 2015 and May 2017, Plaintiff had regular appointments with Dr. Ellens, Dr. Ovando, and rheumatologist, Charles Geringer, M.D. At various of these appointments, she complained of joint pain, continued problems with sores on her scalp and itchy, painful, and bleeding sores, and fatigue. (R. 924-25, 926-29, 971, 967-72.) She was treated with Plaquenil and steroid creams. (*Id.*) In October 2015, Dr. Ovando described the severity of Plaintiff's condition as moderate and stable;

the doctor added "Beta Dip" to her medication regime, which she was to use for two weeks.[8] (*Id.*)

Dr. Geringer's notes from this time period generally reflect that Plaintiff's lupus was "quiet" on her current dose of Plaquenil, which was tolerated without issue. (R. 820-24.) While at an appointment in December 2015, Plaintiff rated her symptoms as "10 out of 10," at other appointments in January and May 2017, she described her pain and symptoms as zero out of 10, and bloodwork from December 2015 and January 2017 showed an absence of active lupus antibodies. (*Id.*, 804.) In January 2016, Plaintiff complained of increased joint pain, but an x-ray of her knees was negative. (R. 816, 824.) Plaintiff told Dr. Geringer in January 2017 that she had visited the emergency room for a number of issues, including joint pain, headaches, and other symptoms she attributed to a lupus flare-ups. (*Id.*). Dr. Geringer ultimately diagnosed Plaintiff with chronic joint pain which was "quiet" on Plaquenil, which she was to continue. (R. 804.)

## B. Hearing Testimony

At the second hearing on March 5, 2018, Plaintiff testified that she had had to deliver her baby two months early because her lupus put strain on her heart and kidneys, and on the baby's heart. (R. 595.) At the time of the hearing Plaintiff was taking two steroids, Prednisone and Hydrocortisone, a skin lotion called Cephalexin, Plaquenil for her lupus, Gabapentin and Oxycodone for pain, an anti-inflammatory medication for her joints, and heart medication. (R. 597-98.)

She testified that she had a lupus flare-up while in the hospital for delivery of her son and continued to contend with boils on various parts of her body, painful and itchy patches of skin on her scalp, joint pain, and headaches, all of which interfered with her concentration. (R. 602-03.)

---

[8] "Beta Dip" is the short name for betamethasone Diprolene. https://www.mayoclinic.org/drugs-supplements/betamethasone-dipropionate-topical-application-route/description/drg-20073667 (visited on September 13, 2019.) Plaintiff had previously used Beta Dip in August 2013.

Plaintiff also testified that her medications made her sleepy and sick to the point of interfering with her ability to focus. (*Id.*) She testified that she dozes off during the day and that, plus her carpel tunnel syndrome, made it difficult to hold her baby; her boyfriend performs a lot of childcare duties instead. (R. 603-04.) Plaintiff also testified that she has "bad days" most of the week and is unable to walk an entire block before getting short of breath, and that she has daily migraines which vary in intensity depending on the amount of medicine she takes. (R. 604-05.)

C.  ALJ Opinion

In his opinion, the ALJ set forth the Social Security Regulations' five-step sequential inquiry for determining whether a claimant is disabled. Specifically, the ALJ found at Step One that Plaintiff was presently unemployed; at Step Two that Plaintiff had the severe impairment of lupus, 20 CFR 404.1520(c) and 416.920(c); and at Step Three that Plaintiff did not meet the Listings for 14.02: Systemic Lupus Erythematous ("SLE"), 8.04: chronic infections of the skin or mucous membranes, or 14.09: inflammatory arthritis. (R. 588.) Next, the ALJ assessed Plaintiff's RFC as being able to perform a full range of work at all exertional levels but with the non-exertional limitations that she avoid all exposure to unprotected heights, moving mechanical parts, operation of motor vehicles as part of the job, concentrated exposure to environmental and pulmonary irritants, and weather, including sunlight and extremes of heat. (R. 570).

The ALJ next explained why he determined that both Plaintiff's depression and her cognitive delay were non-severe. (R. 566.) He analyzed Plaintiff's mental health pursuant to the Paragraph B criteria and found that there was no evidence of a depressive disorder that imposed anything more than a minimal impact on Plaintiff's ability to work. (*Id.*)[9] Other than a notation in

---

[9] Specifically, the ALJ found that Plaintiff had no more than mild limitations in understanding, remembering, or applying information because she had not alleged any significant deficits in this area and has the ability to maintain financial responsibilities, follows written and spoken instructions well, and handles changes well. (R. 567). She had no more than mild limitation in interacting with others because there were no deficits reported in the record and

7

the record that Dr. Ellens had prescribed Xanax at one appointment after plaintiff complained of feeling depressed in the previous two weeks, the ALJ noted that there was no evidence of sustained medication management or any treatment for mental health issues. (*Id.*) Subsequent medical records from Dr. Ellens reflect that Plaintiff was not taking any medication (for depression or otherwise), and in follow up examinations with Dr. Ellens, Plaintiff denied feeling depressed. (*Id.*).

The ALJ also found that the evidence failed to support a finding that Plaintiff had a severe cognitive or learning impairment. (*Id.*). Among the reasons the ALJ gave for this determination, were the fact that the single document diagnosing a cognitive delay and learning disability was from a time well before Plaintiff's alleged onset date, Plaintiff graduated from high school and was able to perform an extensive number of activities of daily living, Plaintiff had been able to obtain and retain employment, and there is no medical evidence in the file that supported a finding that plaintiff had a severe cognitive impairment. (R. 566-67.) The ALJ gave little weight to the opinion of the doctor who diagnosed Plaintiff's cognitive delay because the opinion was rendered 17 years before Plaintiff's alleged onset date of disability and the medical record contained no other treatment notes, reports, or educational materials to support it. (R. 567.)

Next, the ALJ explained that Listing 14.02 requires that a claimant's manifestation of SLE show a marked limitation in at least one of the following: activities of daily living, maintaining social functioning, or completing tasks in a timely manner due to deficiencies in concentration, persistence or pace. (R. 569.) For the same reasons he determined that the Paragraph B criteria showed no more than mild limitations with respect to Plaintiff's mental impairments, the ALJ

---

Plaintiff was able to go out alone, shop in stores, spend time with others socializing, get along well with authority figures, and did not have problems getting along with people. (*Id.*). Plaintiff also had no more than a mild limitation in concentrating, persisting, or maintaining pace because although Plaintiff reported she did not handle stress well, she did report handling changes well and that she usually finishes what she starts, which contradicted her allegation that she cannot pay attention for long. (*Id.*). Finally, the ALJ found that Plaintiff had no limitation in adapting or managing herself because she reported no significant difficulties in her ability to maintain personal care related to any mental health complaints. (*Id.*).

found that the criteria did not support the marked limitations required to meet the Listing for lupus, stating that "none of the limitations asserted by claimant . . . as relates to residuals associated with lupus, have resulted in more than a mild restriction of functioning in any of the areas outlined in [Paragraph B]." (R. 567.)

In further support of his determination that Plaintiff's impairment did not meet the Listing for lupus (or for chronic infections of the skin or mucous membranes), the ALJ cited to SSR 17-2p, which states that an ALJ need not articulate specific evidence supporting his or her finding that a claimant's impairments do not meet a Listing if the ALJ believes that the evidence already received in the record supports that determination. (R. 570.) Instead, "a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding. An adjudicator's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3." (*Id.*)

The ALJ stated that "listing level severity in this case is not demonstrated here" and then moved past Step Three to discuss the evidence that supported his assessment that Plaintiff was not disabled. The ALJ acknowledged Plaintiff's testimony about her symptoms,[10] and that the medical records reflected a consistent diagnosis of SLE of the scalp and ongoing treatment for it by a dermatologist, who prescribed various medications and adjusted them as needed to control flare-ups of her skin symptoms. (R. 572.) However, the ALJ pointed specifically to various medical records that describe Plaintiff's skin issues as stable or improving on medication in 2013 and 2014,

---

[10] Specifically, the ALJ noted that Plaintiff complained of continued problems with boils, painful and itchy spots on her head, joint pain that made it difficult for her to focus, fatigue and sickness from her medication that made it difficult to concentrate, migraines, shortness of breath upon walking more than one block, and the need to wear a brace on her left hand. (R. 571.)

9

and that in January 2016 and January 2017, medical records stated that there were no signs of active disease of the skin. (R. 574.) The ALJ also noted that treatment records reflected that Plaintiff tolerated her Plaquenil without difficulty. (*Id.*) The ALJ additionally noted that, despite testifying at the hearing that she had constant fatigue and was unable to walk even a block because of shortness of breath, the record reflected that Plaintiff reported only "occasional" fatigue and tiredness and denied shortness of breath to her internist. (R. 573).

The ALJ acknowledged Plaintiff's ongoing complaints of joint pain, but noted that treatment records from both her rheumatologist and Dr. Ellens show that she consistently had full range of motion in all joints and no signs of inflammation or tenderness, and medical imaging of her knees was negative for any abnormality. Additionally, the ALJ noted that Plaintiff's bloodwork was negative for lupus antibodies in 2016 and 2017, and that Plaintiff described her pain as zero out of 10 on several occasions. And, at the one appointment at which Plaintiff described her pain as "10 out of 10." she still had no joint tenderness or swelling, had full range of motion, and did not "show any signs of inflammatory disease of the joints" upon her rheumatologist's examination. (R. 574.) Finally, the ALJ suggested that Plaintiff's lupus flare-ups coincided with medication non-compliance.

The ALJ explained that the case was before him on remand for the purpose of evaluating the proper weight to give Dr. Ellens' January 2014 opinion. (R. 572.) He wrote that after considering that opinion again in conjunction with the full medical record, the file "remains absent objective medical evidence to substantiate a finding of disability or to essentially substantiate a maximum residual functional capacity more restrictive than that previously determined in the prior May 2015 . . . decision." (*Id.*) Like he had after the first hearing, the ALJ again found that Dr. Ellens' opinion was not supported by the medical evidence, which consistently relayed less severe

symptoms and limitations from lupus than suggested by Dr. Ellens' opinion. (R. 577.) Moreover, the ALJ also found that medical evidence that post-dated the first hearing bolstered this conclusion. (*Id.*) For example, the ALJ noted that despite Dr. Ellens' opinion that Plaintiff met the Listing for lupus and had an RFC that precluded work, his treatment notes from November 2014 through August 2016 state that Plaintiff was on "no active meds." (R. 577). And, when the Plaintiff saw Dr. Ellens for a TB shot before returning to work, treatment notes stated that she was not on any medication and was only to follow up as needed. (*Id.*). These facts, in addition to the fact that Dr. Ellens was an internist and did not specialize in lupus, supported giving his opinion little weight, the ALJ concluded (*Id.*).[11]

Finally, the ALJ gave the state agency medical consultants' opinions great weight because they were consistent with the medical evidence and the RFC the ALJ assessed. He specifically noted that there was no new material information that would significantly alter the state agency findings or change his RFC assessment. (R. 578). Ultimately, at Step Four, the ALJ found that Plaintiff had no past relevant work because she hadn't performed any of her previous jobs for long enough (or earned enough) to constitute substantial gainful activity pursuant to SSR 82-72. (R. 578.) At Step Five, the ALJ found that there were other jobs in significant numbers in the national economy that Plaintiff was able to perform. (*Id.*)

## III.  STANDARD OF REVIEW

We review the ALJ's decision deferentially and will affirm if it is supported by substantial evidence. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). Substantial evidence is "such

---

[11] The ALJ appears to consider Dr. Ellens' notes that Plaintiff was on "no active meds" as evidence that he could not have considered Plaintiff's lupus as severe as he indicated in his opinion. In fact, Dr. Ellens was wrong about Plaintiff's medication, as concurrent treatment notes from her rheumatologist and dermatologist document that she was taking a number of medications, including steroid creams and other prescriptions. It is unclear if the ALJ recognized Dr. Ellens' mistake.

11

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (internal citations omitted). We do not reweigh evidence or substitute our own judgment for that of the ALJ. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). In rendering a decision, the ALJ "must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

## IV. ANALYSIS

We agree with one of Plaintiff's arguments for remand: that the ALJ erred in his treatment of the medical opinions, and thus, remand the case on that basis.

Specifically, the ALJ's reliance on the 2013 opinion of the state agency doctors as support for his RFC is flawed.[12] The ALJ gave "great weight" to this opinion before determining that Plaintiff was able to work at any level of physical exertion and was thus not disabled. In 2017, Judge Rowland criticized the ALJ's reliance on the state doctors' opinion because they had not reviewed some of the medical evidence, including treatment notes from Plaintiff's then-

---

[12] We do not fault the ALJ's reasons for rejecting Dr. Ellens' opinion. Normally, "[a] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir.2004) (citing 20 C.F.R. § 404.1527(d)(2)). An ALJ thus may discount a treating physician's medical opinion if it the opinion "is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability." *Skarbek*, 390 F.3d at 503 (internal quotations and citations omitted).

The ALJ described medical evidence – including that from Plaintiff's current rheumatologist – that contradicts Dr. Ellens' opinion that Plaintiff meets the Listing for lupus and his RFC opinion that Plaintiff was unable to work. Specifically, with respect to the requirements for Listing 14.02 subsection A, the ALJ points to the uncontradicted medical evidence from Plaintiff's rheumatologist that her lupus does not include organ involvement. And with respect to the requirements for Listing subsection B, the ALJ explains the reasons that Plaintiff does not exhibit marked limitations in activities of daily living, maintaining social functioning, or completing tasks in a timely manner due to deficiencies in concentration, persistence or pace. Moreover, even accepting that Plaintiff's complaints of occasional fatigue and tiredness are sufficiently severe to support the Listing, there is no evidence in the record (and Plaintiff identifies none) that she also suffered from a second condition of fever, malaise or weight loss.

rheumatologist. *Johnson I*, 2017 WL 3620807 at *9. The universe of medical evidence that the state agency doctors did not review has only grown since then, making the ALJ's reliance on the opinion even less supportable. The state agency doctors did not even consider the Listing or criteria for lupus, but instead confined their opinion to consideration of whether Plaintiff met the Listing for chronic infections of the skin or mucous membranes, a Listing that does not include criteria for joint pain or fatigue. And while the ALJ persisted in his second opinion in giving little weight to Dr. Ellens' opinion because Dr. Ellens is not a rheumatologist, the ALJ did not discredit the state doctors' opinion on the same basis. For these reasons, we agree with Plaintiff that the ALJ's reliance on the state agency doctors' opinion to support his RFC determination was erroneous.

There are no other opinions in the medical record, and the ALJ does not explain how he came to the conclusion that Plaintiff was able to work at all levels of physical exertion.[13] While we recognize that there are a number of medical records that indicate Plaintiff's lupus was "quiet" and "well-controlled" on her current medication regime, and that at times, she rated her symptoms as "zero," the record also contains consistent complaints of joint pain, fatigue and tiredness. Moreover, Dr. Geringer diagnosed her with chronic joint pain, and Dr. Kazmar assessed arthritis pain in Plaintiff's knees and spine. Although the ALJ mentions some of this evidence, he does not explain whether or how he accounts for it in his RFC determination. *See Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (ALJ failed to account for all of Plaintiff's impairments in the medical record and his RFC.) An additional problem with the ALJ's opinion is that he ties Plaintiff's lupus "flare-ups" with her alleged non-compliance with her medication. However, the record only describes a single occasion when Plaintiff ran out of her Plaquenil and had a flare-up;

---

[13] There is no evidence in the record the Plaintiff ever performed work beyond the light exertion level, making the ALJ's opinion that she could work at all levels of exertion even more questionable. (R. 607-08.)

other evidence describes lupus flare-ups at various times despite the fact that Plaintiff was taking a number of medications, including steroids.[14]

Although it is possible that a doctor might look at the entire medical record and conclude that Plaintiff's condition does not create any physical restrictions on her ability to work, the ALJ made that determination without reference to any competent medical opinion that Plaintiff had no physical restrictions at all on her ability to work. *See James v. Commissioner of Social Security*, No. 4:17-cv-4155, 2018 WL 3434326 at *5 (C.D. Ill. May 23, 2018) (ALJ impermissibly "played doctor" by rejecting all medical opinions before determining claimant's RFC on his own.) This error is especially stark when the medical record contains additional evidence not reviewed by any medical professional. *See Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (remanding where ALJ failed to submit new and potentially significant MRI to medical scrutiny and instead accepted opinions of consultative physicians who did not see the later medical evidence.)

## CONCLUSION

We are unable to trace the ALJ's reasoning from the medical evidence of Plaintiff's impairment to the conclusion that she is not disabled. On remand, the ALJ should consider whether to obtain an updated medical opinion regarding the Plaintiff's ability to work that is based on consideration of the entire medical record.

**ENTER:**

GABRIEL A. FUENTES
United States Magistrate Judge

**DATED: November 15, 2019**

---

[14] We make no determination as to whether the ALJ believed Dr. Ellens' erroneous notes that Plaintiff was on no active meds for much of the claims period or if that belief was related to his determination that Plaintiff's lupus flare-ups were tied to non-compliance with her medication.